# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| DOUG HERMANSON, an individual,<br><br>       Respondent/Cross Appellant,<br><br>     v.<br><br>MULTI-CARE HEALTH SYSTEM, INC., a Washington Corporation d/b/a TACOMA GENERAL HOSPITAL, JANE and JOHN DOES 1-10 and their marital communities comprised thereof,<br><br>       Appellant/Cross Respondent. | No.  51387-1-II<br><br><br><br><br><br>PUBLISHED OPINION |

WORSWICK, J. — This case presents two questions of controlling law.  First, does the corporate attorney-client privilege apply to a nonparty physician who is an agent, but not an employee, of a hospital?  And second, does the corporate attorney-client privilege apply to nonphysician employees of a hospital who are parties to the lawsuit?  We answer the first question in the negative, and the second question in the affirmative.

During the course of a discovery dispute, the superior court issued an order that (1) prohibited MultiCare Health System Inc.'s counsel from having ex parte, privileged communications with a physician who is an admitted agent of MultiCare but not an employee; (2) prohibited MultiCare's counsel from having ex parte, privileged communications with a social worker employed by MultiCare; (3) allowed ex parte, privileged communications with nurses employed by MultiCare; and (4) required MultiCare to seek leave of court prior to having ex parte communications with any other "MultiCare healthcare providers."

We affirm the superior court's order to the extent that it (1) prohibited ex parte privileged communications with the physician, and (2) allowed ex parte privileged communications with the nurses. We reverse the superior court's order to the extent that it (3) prohibited ex parte privileged communications with the social worker, and (4) required MultiCare to seek leave of court prior to having ex parte communications with any other MultiCare healthcare providers.

FACTS

A.    *The Incident*

Doug Hermanson, while speeding in his pickup truck, sideswiped a parked vehicle, crossed the center line, and collided head on with a power pole. Hermanson's head penetrated the windshield. He was transported to Tacoma General Hospital, where he was treated by a trauma team for his injuries. Relevant here, Hermanson received treatment from:

(1)    Dr. David Patterson, a Trauma Trust employee, and admitted agent of MultiCare;
(2)    Nurse Pauleen Wheeler, a MultiCare employee;
(3)    Nurse Carla Defibaugh, a MultiCare employee; and
(4)    Clinical social worker, Lori Van Slyke, a MultiCare employee.

Hermanson was given a blood alcohol screen. He had a "high [blood alcohol level] on admission," but he denied consuming alcohol. Clerk's Papers (CP) at 88. The blood alcohol screen indicated a blood alcohol level of 330 mg/dL.

Law enforcement went to Tacoma General as part of the accident investigation. At some point, a healthcare provider allegedly disclosed Hermanson's blood alcohol level to law enforcement. At the hospital, Hermanson was issued a citation for first degree negligent driving. Hermanson was later charged with first degree negligent driving, and hit and run of an unattended vehicle.

2

No. 51387-1-II

B.      *MultiCare and Trauma Trust Background*

MultiCare, a nonprofit corporation, operates Tacoma General.  MultiCare, CHI Franciscan Health Systems, Madigan Army Medical Center, and Pierce County Medical Society formed Trauma Trust, a nonprofit corporation, to provide trauma services.  Trauma Trust was created to address the lack of adult trauma services being offered in the area and to share the risk and resources of providing those services.

Trauma Trust employs physicians and other professionals to deliver trauma services. Trauma Trust employee physicians have privileges at each participating hospital, including Tacoma General.  As it pertains to services provided at MultiCare facilities, Trauma Trust's employees are agents of MultiCare, and MultiCare is responsible for any care they deliver within the scope of their duties providing trauma services.

Trauma Trust is closely affiliated with MultiCare.  The administrative offices for Trauma Trust are located within Tacoma General, and MultiCare provides billing and technical support to Trauma Trust.  Dr. Patterson has an office at Tacoma General.

C.      *Procedural Background*

Based on the disclosure of Hermanson's blood alcohol level, Hermanson sued MultiCare, and Jane and John Does 1-10, identified as individuals employed by MultiCare, for negligence, defamation, false imprisonment, and violation of physician-patient privilege under RCW

3

5.60.060(4).[1] Hermanson did not allege personal injuries or other medical malpractice. Hermanson's complaint did not name either Trauma Trust or Dr. Patterson.[2]

A single law firm was retained to represent MultiCare, Dr. Patterson, and Trauma Trust in connection with Hermanson's lawsuit. Although Trauma Trust was not named in the lawsuit, Trauma Trust retained counsel because Hermanson's "demand letter clearly implicated the Emergency Department at Tacoma General Hospital and trauma services." CP at 543. Additionally, MultiCare recognized that Dr. Patterson was an agent of MultiCare in providing care to Hermanson. Trauma Trust, Dr. Patterson, and MultiCare signed a letter confirming joint representation.

1. *Protective Order*

During the initial stages of the lawsuit, MultiCare's counsel notified Hermanson that it represented MultiCare and its employee-social worker and employee-nurses, Trauma Trust, and Dr. Patterson. Hermanson objected to MultiCare's counsel representing the social worker, nurses, Trauma Trust, and Dr. Patterson.

MultiCare sought a protective order "confirming the right of MultiCare's attorneys to have ex parte privileged communications" with its clients, including but not limited to Dr.

---

[1] RCW 5.60.060(4) provides that, with few exceptions, "a physician or surgeon or osteopathic physician or surgeon or podiatric physician or surgeon shall not, without the consent of his or her patient, be examined in a civil action as to any information acquired in attending such patient, which was necessary to enable him or her to prescribe or act for the patient."

[2] Dr. Patterson is not a "John Doe" listed in the complaint, because Hermanson's complaint identified the Jane and John Does as employees of MultiCare. CP at 1.

No. 51387-1-II

Patterson, the nurses, and the social worker, who had direct knowledge of the alleged negligence at issue.[3]

MultiCare argued that it was entitled to have communications with Dr. Patterson, the nurses, and the social worker based on corporate attorney-client privilege under *Loudon v. Mhyre*,[4] *Upjohn Co. v. United States*,[5] and *Youngs v. PeaceHealth*.[6]  Specifically, it argued that its attorney-client privilege allowed ex parte privileged communications with MultiCare's agents who had firsthand knowledge of the alleged negligent event, namely Dr. Patterson, the social worker, and the nurses.  MultiCare also argued that it was entitled to ex parte privileged communications with Dr. Patterson under the joint representation agreement.

---

[3] MultiCare's motion for protective order references other members of the trauma team who treated Hermanson.  Those individuals were not referenced at the hearing or in the superior court's order.  It appears that Dr. Patterson, the social worker, and the nurses were identified by name because the attorney-client dispute arose when Hermanson was attempting to schedule depositions with them.

[4] *Loudon v. Mhyre*, 110 Wn.2d 675, 756 P.2d 138 (1988).  Under the "*Loudon* rule," in a personal injury case, defense counsel is prohibited from communicating ex parte with the plaintiff's nonparty treating physician.

[5] *Upjohn Co. v. United States*, 449 U.S. 383, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981).  *Upjohn* held that the corporation's attorney-client privilege extends to low- and mid-level employees to encourage full disclosures and open communication with attorneys.

[6] *Youngs v. PeaceHealth*, 179 Wn.2d 645, 650-51, 316 P.3d 1035 (2014).  *Youngs* held that the corporate attorney-client privilege trumps the *Loudon* rule and allows some communication between corporate counsel and employee physicians.

5

Hermanson[7] argued that counsel was prohibited from having ex parte privileged

communication with Dr. Patterson under *Loudon*, and because he was not a MultiCare employee,

*Youngs* did not apply. Hermanson further argued that counsel was prohibited from having ex

parte privileged communication with the nurses under *Youngs* because they are not physicians.

Further, Hermanson argued that because the nurses did not appear to have released Hermanson's

healthcare information, they could not have firsthand knowledge of the alleged negligent event

"unless MultiCare intends on certifying [they were] present when Dr. Patterson or [the social

worker] disclosed plaintiff's health care information." CP at 66. Hermanson also argued that

counsel was prohibited from having ex parte privileged communication with the social worker

under *Loudon* and *Wright v. Group Health*.[8]

2. *The Superior Court's Decision*

The superior court ruled that, under *Youngs*, ex parte privileged communication with Dr.

Patterson was prohibited because he was not MultiCare's employee. With regard to the nurses,

the court allowed ex parte privileged communication, noting:

> [The] nurses who may have had contact with the injured individual in this case,
> even though they're not physicians, that would fall under the physician-patient
> purview that was before the Court with *Youngs vs. PeaceHealth*. These are

---

[7] Hermanson alleges that "MultiCare asserted it can have secret, ex parte conversations" with "all of plaintiff's MultiCare health care providers it wants, on any issue, and to prevent plaintiff from taking discovery on it." CP at 56. The record controverts Hermanson's allegations. MultiCare sought ex parte, privileged communications with MultiCare's agents who had knowledge of the alleged negligent event and related to the alleged negligent event. Further, counsel told Hermanson that he is "free to ask [Dr. Patterson] about his knowledge of the facts," but not about his discussions with counsel. CP at 49.

[8] *Wright v. Grp. Health Hosp.*, 103 Wn.2d 192, 193, 691 P.2d 564 (1984). *Wright* held that employees of defendant healthcare organization were considered "parties" for purposes of the disciplinary rule dealing with ex parte communications if the employee had the authority to speak for and bind the corporation.

employees of MultiCare Health System, it appears; and I think, in line with the reasoning given by the Court, they would fall under something that the Court did not have before it but very similar reasoning.

Verbatim Report of Proceedings (VRP) (Aug. 11, 2017) at 25.

And with regard to the social worker, the court prohibited ex parte privileged communications, saying:

I believe this individual is a social worker; and I don't believe [the social worker] falls under either the employee-physician or anything like a physician-patient analysis that the Court went through for the physicians, even though she is an employee of MultiCare; and, therefore, I don't believe *Youngs vs. PeaceHealth*, she falls under that privilege that can be afforded [the nurses]; and, therefore, that ex parte communication would be denied.

VRP (Aug. 11, 2017) at 25.

The court entered an order granting in part and denying in part MultiCare's motion for protective order. The court's order also required MultiCare's counsel to seek leave of the court prior to ex parte communications with "other MultiCare healthcare providers."[9] CP at 136. MultiCare moved for reconsideration, which was denied.

D.      *Discretionary Review*

The trial court certified for discretionary review the protective order and order denying MultiCare's motion for reconsideration. We granted MultiCare's motion for discretionary

---

[9] After the superior court entered its order on MultiCare's motion for protective order, Hermanson filed an amended complaint. The amended complaint did not add additional parties. It added only a cause of action for violation of RCW 70.02.020 ("Disclosure by health care provider.") and sought attorney fees under RCW 70.02.020.

review under RAP 2.3(b)(4),[10] and considered Hermanson's response to the motion as a cross motion for discretionary review, which we also granted.

ANALYSIS

A.    *Legal Principles*

1. *Standard of Review*

We review a superior court's discovery order for abuse of discretion. *Richardson v. Gov't Emps. Ins. Co.*, 200 Wn. App. 705, 711, 403 P.3d 115 (2017), *review denied*, 190 Wn.2d 1008 (2018). A superior court abuses its discretion where the court's decision was manifestly unreasonable or made for untenable reasons. *Richardson*, 200 Wn. App. at 711. Further, a superior court abuses its discretion if its decision is based on the wrong legal standard, or on an improper understanding of the law. *Richardson*, 200 Wn. App. at 711. When a superior court's decision rests on a question of law, such as statutory interpretation or judicial decisions, we review the decision de novo. *Fellows v. Moynihan*, 175 Wn.2d 641, 649, 285 P.3d 864 (2012); *Richardson*, 200 Wn. App. at 711.

2. *Legal Background: Attorney-Client Privilege*

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 682, 66 L. Ed. 2d 584 (1981). The purpose of the privilege "is to encourage full and frank communication between attorneys and their clients," recognizing "that sound legal

---

[10] RAP 2.3(b)(4) provides for review where the "superior court has certified, or all the parties to the litigation have stipulated, that the order involves a controlling question of law as to which there is substantial ground for a difference of opinion and that immediate review of the order may materially advance the ultimate termination of the litigation."

advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389.

The attorney-client privilege is codified in Washington at RCW 5.60.060(2)(a), which provides: "An attorney or counselor shall not, without the consent of his or her client, be examined as to any communication made by the client to him or her, or his or her advice given thereon in the course of professional employment." To qualify for the privilege, communications must have been made in confidence and in the context of an attorney-client relationship. *Newman v. Highland Sch. Dist. No. 203*, 186 Wn.2d 769, 777, 381 P.3d 1188 (2016).

As both the United States Supreme Court and the Washington State Supreme Court have recognized, the attorney-client privilege extends to corporate clients and may include communications with nonmanagerial and lower level employees. *Upjohn*, 449 U.S. at 391, 396; *Newman*, 186 Wn.2d at 777-78; *Youngs*, 179 Wn.2d at 650-51. "[C]orporate litigants have the right to engage in confidential fact-finding and to communicate directions to employees whose conduct may embroil the corporation in disputes." *Newman*, 186 Wn.2d at 779.

The Washington Supreme Court has adopted *Upjohn*'s flexible approach to corporate attorney-client privilege and its "central policy concern" of facilitating "frank communication about alleged wrongdoing." *Youngs*, 179 Wn.2d at 664, 662. *Upjohn* sought to "protect counsel's ability to 'ascertain the factual background' of a 'legal problem.'" *Youngs*, 179 Wn.2d at 664 (quoting *Upjohn*, 449 U.S. at 390). *Upjohn* noted that "in the context of corporate liability, low- and mid-level employees might well be the only source of information relevant to legal advice." *Youngs*, 179 Wn.2d at 662. And without being able to have ex parte privileged

communications with those employees, "corporate counsel 'may find it extremely difficult, if not impossible, to determine what happened' to trigger potential corporate liability," and to adequately advise the client. *Youngs*, 179 Wn.2d at 662 (quoting *Upjohn*, 449 U.S. at 391-92).

3. *Physician-Patient Privilege*

Neither federal nor state law has recognized a physician-patient privilege at common law. *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 926 (7th Cir. 2004); *Carson v. Fine*, 123 Wn.2d 206, 212, 867 P.2d 610 (1994). In Washington, the physician-patient privilege is statutorily created, and "not a rule of substantive or constitutional law." *Carson*, 123 Wn.2d at 212. Because the physician-patient privilege is in derogation of common law, it must be strictly construed. *Carson*, 123 Wn.2d at 213.

The physician-patient privilege is codified at RCW 5.60.060(4), and provides that a physician cannot "be examined in a civil action" about any information obtained through the physician's attending of the patient that was necessary to enable the care. The purpose behind the physician-patient privilege is to promote proper treatment by encouraging full disclosure and to protect the patient from embarrassment. *Smith v. Orthopedics Int'l, Ltd.*, 170 Wn.2d 659, 667, 244 P.3d 939 (2010). The physician-patient privilege is automatically waived, to all physicians related to all conditions, 90 days after a plaintiff files an action for personal injuries or wrongful death. RCW 5.60.060(4); *Youngs*, 179 Wn.2d at 656.

4. *The Intersection of Attorney-Client Privilege and Physician-Patient Privilege*

Washington appears to have addressed the intersection of corporate attorney-client privilege and the physician-patient privilege only once, in *Youngs*, 179 Wn.2d 645. *Youngs* analyzed *Loudon*, and provided a framework for analyzing claims of conflicting attorney-client

and physician-patient privileges. *Youngs*, 179 Wn.2d at 652-53. Both *Loudon* and *Youngs* are medical malpractice cases, involving personal injury and wrongful death claims. Hermanson does not make claims for personal injury or wrongful death.

*Loudon* was a wrongful death action, and the court addressed whether defense counsel could have ex parte contact with the decedent's physicians who were uninvolved in the events leading to the death and subsequent litigation. *Loudon v. Mhyre*, 110 Wn.2d 675, 676, 756 P.2d 138 (1988). In *Loudon*, the decedent suffered injuries in a car accident in Washington. Two Washington physicians treated the decedent for his injuries and then released him from the hospital. *Loudon*, 110 Wn.2d at 676. The decedent then returned home to Oregon, and received additional treatment from two Oregon physicians. *Loudon*, 110 Wn.2d at 676. Roughly one month after returning to Oregon, the decedent suffered complications and died. *Loudon*, 110 Wn.2d at 676. The decedent's father brought a wrongful death action against the two Washington physicians. The decedent's father voluntarily provided medical records from the Oregon physicians to the Washington physicians. *Loudon*, 110 Wn.2d at 676. Defense counsel then moved for an order declaring the physician-patient privilege waived[11] and authorizing ex parte contact with the Oregon physicians. *Loudon*, 110 Wn.2d at 676.

The court held that although the decedent's privilege had been waived, defense counsel was prohibited from having ex parte contact with the Oregon physicians. *Loudon*, 110 Wn.2d at 680, 678 n.2. The court limited defense counsel to conducting discovery through the court's

---

[11] At the time Loudon filed his action, RCW 5.60.060(4) did not provide that the plaintiff automatically waives the privilege 90 days after filing of a personal injury or wrongful death action. *Loudon*, 110 Wn.2d at 678 n.2.

procedural rules. *Loudon*, 110 Wn.2d at 680. Importantly, *Loudon* did not address attorney-client privilege, or communications between a corporation's counsel and a corporation's employees. *See Loudon*, 110 Wn.2d at 681.

In *Youngs*, one of the plaintiffs was admitted to a hospital for surgery. *Youngs*, 179 Wn.2d at 654. While in the hospital, the plaintiff developed an infection that resulted in personal injuries. The plaintiff brought a personal injury action against the corporation that owned and operated the hospital. *Youngs*, 179 Wn.2d at 653. The plaintiff's complaint identified the two physicians, employed by the corporation, whose conduct led to his lawsuit, but the complaint did not name those physicians as defendants. *Youngs*, 179 Wn.2d at 654. The plaintiff's interrogatory answers suggested that several other unidentified physicians also were at fault. *Youngs*, 179 Wn.2d at 654. The plaintiff did not object to defense counsel's ex parte contact with the two physicians identified in his complaint, but the plaintiff objected to ex parte contacts with "any other physician" who had treated him at the hospital. *Youngs*, 179 Wn.2d at 654. Citing *Loudon*, plaintiff moved to prohibit defense counsel from ex parte contact with plaintiff's treating healthcare providers, except for the two physicians identified in the complaint.

The court addressed the relationship between *Upjohn* and the corporate attorney-client privilege, *Loudon*, and the physician-patient privilege. *Youngs*, 179 Wn.2d at 650, 652-53. Our Supreme Court relied on *Upjohn*'s reasoning to resolve the potential conflict between *Upjohn* and *Loudon*. *Youngs*, 179 Wn.2d at 663. In keeping with the policy concerns announced in *Upjohn*, the court held:

> [T]he corporate attorney-client privilege trumps the *Loudon* rule where an ex parte interview enables corporate counsel "to determine what happened" to trigger the litigation.

12

*Youngs*, 179 Wn.2d at 664 (quoting *Upjohn*, 449 U.S. at 392). If *Loudon* conflicts with a defendant's corporate attorney-client privilege, *Loudon* "must yield to that privilege." *Youngs*, 179 Wn.2d at 671.

> This means that an attorney hired by a corporate defendant to investigate or litigate an alleged negligent event may engage in privileged (ex parte) communications with the corporation's physician-employee where the physician-employee has firsthand knowledge of the alleged negligent event and where the communications are limited to the facts of the alleged negligent event.

*Youngs*, 179 Wn.2d at 671.

5. *Expansion of the Attorney-Client Privilege*

Neither *Loudon* nor *Youngs* addresses defense counsel's corporate attorney-client privilege with respect to a nonphysician healthcare provider. And *Youngs* does not address the corporate attorney-client privilege as it relates to an employee who is not a physician or a physician who is not an employee.

In *Youngs*, the dissent advocated for applying the *Loudon* rule in medical malpractice cases, regardless of whether the physician is employed by the defendant. *Youngs*, 179 Wn.2d at 682 (Stephens, J. concurring in part/dissenting in part). The dissent emphasized the ongoing value of the physician-patient relationship, arguing that the majority's holding would create practical difficulties and uncertain expectations, particularly in light of the large-scale corporate structure of healthcare systems. *Youngs*, 179 Wn.2d at 677, 680 (Stephens, J., dissenting in part).

The dissent argued that the employer-employee relationship did not justify departing from the parameters established in *Loudon* and that the attorney-client privilege did not "necessitate allowing ex parte communications with nonparty treating physicians in the corporate

13

medicine setting."  *Youngs*, 179 Wn.2d at 682 (Stephens, J., dissenting in part).  The dissent

noted that the policies announced in *Upjohn* would not be "defeated by respecting the *Loudon*

rule in this context, as the facts remain fully available to both parties, albeit through normal

discovery channels."  *Youngs*, 179 Wn.2d at 682 (Stephens, J., dissenting in part).  The dissent

argued that "the court in *Loudon* was 'unconvinced that any hardship caused the defendants by

having to use formal discovery procedures outweighs the potential risks involved with ex parte

interviews.'"  *Youngs*, 179 Wn.2d at 681(Stephens, J., dissenting in part) (quoting *Loudon*, 110

Wn.2d at 680).

Two years after *Youngs* was decided, the court addressed whether the corporate attorney-

client relationship extended to former employees.  *Newman*, 186 Wn.2d at 780.  Consistent with

the spirit of the *Youngs* dissent, the Supreme Court declined to "expand the privilege to

communications outside the employer-employee relationship."  *Newman*, 186 Wn.2d at 780.

The court acknowledged that although former employees may possess critical information and

may expose the corporation to vicarious liability, those possibilities do "not justify expanding the

attorney-client privilege beyond" the employer-employee relationship.  *Newman*, 186 Wn.2d at

781.

B.      *Communications with Dr. Patterson*

MultiCare argues that the superior court erred by prohibiting ex parte privileged

communications with Dr. Patterson because he is not an employee.  Specifically, MultiCare

argues that its corporate attorney-client privilege extends to Dr. Patterson because (1) Dr.

Patterson is MultiCare's admitted agent and the functional equivalent of an employee, and under

the policy reasons announced in *Youngs* and *Upjohn*, there is no reasoned distinction between

Dr. Patterson and employee; and (2) counsel represents Dr. Patterson under the joint representation agreement. We disagree.

1. *Agent or Employee*

The superior court, relying on *Youngs*, prohibited ex parte privileged communications with Dr. Patterson because, although he is MultiCare's admitted agent, he is not a MultiCare employee. The crux of our inquiry is whether a non-employee agent of the corporation, who is implicated in the alleged negligent incident, falls within the scope of corporate attorney-client privilege.

a. *Admitted Agent*

MultiCare argues that Dr. Patterson is its admitted agent, and therefore, we should expand *Youngs* to hold that MultiCare's corporate attorney-client privilege extends to both MultiCare's employees and admitted agents. MultiCare further argues that it is responsible for Dr. Patterson's acts within the scope of providing trauma services and that Dr. Patterson could provide valuable information to help counsel advise and represent MultiCare.

But our Supreme Court rejected similar arguments in *Newman*. *Newman*, 186 Wn.2d at 780, 782. There, the court expressly declined to expand the scope of corporate attorney-client privilege beyond the employer-employee relationship. Like in *Newman*, Hermanson's physician-patient privilege is not outweighed by the fact that Dr. Patterson is MultiCare's admitted agent and that MultiCare could be held vicariously liable for Dr. Patterson's acts. *See Newman*, 186 Wn.2d at 782.

The corporation is still able to defend itself and protect its interests under *Loudon*. Under *Loudon*, corporations are still able to conduct prelitigation investigations and have quality

15

improvement committees. *See Youngs*, 179 Wn.2d at 680 (Stephens, J., dissenting in part). Further, under *Loudon*, a "corporate defendant remains free to engage in privileged communications with its employees other than the plaintiff or the plaintiff's nonparty treating physicians, before and throughout litigation." *Youngs*, 179 Wn.2d at 680 (Stephens, J., dissenting in part). And hospitals are still able to seek all of the information it needs through medical records, depositions, or written questions, or informal interviews with both counsel present.

### b. *Functional Equivalent*

Regarding Multicare's argument that Dr. Patterson is the functional equivalent of an employee, we have been unable to find Washington authority addressing the distinction between agents and employees for purposes of defining the scope of the "client" in attorney-client privilege. Federal courts, however, have expanded the attorney-client privilege to allow privileged communications with a contractor who "in all relevant respects [was] the functional equivalent of an employee." *In Re Bieter Co.*, 16 F.3d 929, 937-38 (8th Cir. 1994). We note that in those cases, the independent contractors were enmeshed in the management structure. *See Bieter*, 16 F.3d at 937-38; *see also U.S. v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010).

In *Bieter*, the Eighth Circuit extended privilege to communications between an independent contractor for a real estate partnership and the partnership's counsel. *Bieter*, 16 F.3d at 933-34, 938. The contractor in *Bieter* had interacted on a daily basis with the partnership's principals and was involved in the transaction that gave rise to the suit. *Bieter*, 16 F.3d at 938. As such, the court determined there was "no principled basis" to deny the contractor the same privilege afforded to an employee because "his involvement in the subject of the

litigation makes him precisely the sort of person with whom a lawyer would wish to confer confidentially" to encourage complete disclosure. *Bieter*, 16 F.3d at 938.

In *Graf*, the Ninth Circuit adopted the principles articulated in *Bieter*, finding the attorney-client privilege to apply to communications between a "functional employee" of a company and the company's counsel. *Graf*, 610 F.3d at 1159. There, the court reasoned that although the consultant denied being an agent of the company, he consistently conducted business on behalf of the company and behaved as someone "empowered to act on behalf of the corporation." *Graf*, 610 F.3d at 1159.

It appears Washington courts have not adopted the federal courts' approach or extended the corporate attorney-client privilege to the "functional equivalent of an employee." Moreover, we note a reluctance of our Supreme Court to expand the reach of the corporate attorney-client privilege. *See Newman*, 186 Wn.2d at 781-82. Thus, we decline to adopt the federal courts' approach.

2. *Representation of Dr. Patterson Under Joint Representation Agreement*

MultiCare argues that the superior court's order "ignored Dr. Patterson's individual attorney-client privilege as a person jointly represented by defense counsel under a joint representation agreement" and that the order violates both Dr. Patterson and MultiCare's due process right to representation by their chosen counsel. Br. of Appellant/Cross Resp't at 17.

a. *Joint Representation Agreement*

Although neither party raised or briefed the issue on appeal, it is unclear whether MultiCare has standing to assert Patterson's individual attorney-client privilege or Patterson's constitutional right to counsel where Patterson is not a party to this action. Nonetheless, even

assuming that MultiCare can assert Dr. Patterson's attorney-client privilege, the argument fails. *See Olson v. Haas*, 43 Wn. App. 484, 487, 718 P.2d 1 (1986).

MultiCare appears to argue that Dr. Patterson's joint representation agreement overrides Hermanson's physician-patient privilege. MultiCare's argument related to its right to represent Dr. Patterson under the joint representation agreement is based on its position that the underlying policies announced in *Loudon* are inapplicable here. But MultiCare does not offer any authority demonstrating that it can circumvent the rules of corporate attorney-client privilege or physician-patient privilege by entering into a joint representation agreement, or that MultiCare can contract around the plaintiff's physician-patient privilege by entering into a joint representation agreement.

b. *Due Process*

We do not address MultiCare's arguments regarding Dr. Patterson's constitutional rights. First, MultiCare does not provide authority for its counsel to assert Dr. Patterson's due process rights where Dr. Patterson is not a party to the action. Second, the record is devoid of any declaration of Dr. Patterson asserting that Multicare's attorneys are his chosen counsel.

C. *Communications with the Social Worker and Nurses*

MultiCare next argues that the superior court erred by prohibiting ex parte privileged communications with the social worker. Hermanson argues that the superior court erred by

allowing ex parte privileged communications with the nurses.[12] We hold that the superior court erred by prohibiting ex parte privileged communications with the social worker but that it did not err in allowing communication with the nurses.

Similar to the physician-patient privilege, the legislature has provided statutory social worker-patient and nurse-patient privileges.[13] RCW 5.60.060(9); RCW 5.62.020.[14] We turn to the conflict between the social worker-patient and nurse-patient privileges and the corporate attorney-client privilege, where the social worker or nurse is employed by the defendant corporation.

*Youngs* addressed a similar conflict. As discussed above, in *Youngs*, the attorney-client privilege was in conflict with the physician-patient privilege. 179 Wn.2d at 651. *Youngs* provided:

> [C]ertain ex parte communications between a hospital's corporate defense counsel
> and hospital employees may be protected by *Upjohn* but barred by *Loudon*. Indeed,

---

[12] Hermanson asserts that "it must be noted that perhaps a full one third of MultiCare's argument is based on issues it did not raise below," including the issue of whether *Loudon* is inapplicable to the social worker because she's not a physician. Br. of Resp't/Cross Appellant at 25. MultiCare disputes Hermanson's assertion. MultiCare is correct; it did raise the issue of *Loudon*'s applicability to nonphysicians below.

[13] Hermanson argues that the physician-patient privilege applies to the social worker and the nurses. Hermanson contends that the physician-patient privilege includes "not only medical doctors, but every provider or person facilitating that overall treatment." Br. of Resp't/Cross Appellant at 25. We note that both social workers and nurses are subject to their own respective patient privileges. RCW 5.60.060(9); RCW 5.62.020.

[14] RCW 5.60.060(9) provides that an "independent clinical social worker" who is "licensed under chapter 18.225 RCW" may not disclose or be compelled to testify about information obtained from persons consulting the individual in a professional capacity in order to render professional services. The record provides that the social worker here is an independent clinical social worker. CP at 88 (showing the social worker's name on the medical records, followed by "LICSW").

> depriving counsel of the ability to communicate confidentially with a client damages the privilege just as much as disclosing a prior communication.

> We rely upon *Upjohn*'s reasoning to resolve this conflict. The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law," and it "promote[s] broad[ ] public interests in the observance of law and administration of justice."

*Youngs*, 179 Wn.2d at 663 (alteration in original) (citation omitted) (internal quotation marks omitted). The court addressed the underlying purposes of both privileges and adopted a "modified version of the *Upjohn* test" to resolve its inquiry. *Youngs*, 179 Wn.2d at 653.

Here, the policy concerns related to the attorney-client privilege are identical to those discussed in *Youngs* and *Upjohn*. The parties do not argue that the social worker-patient or the nurse-patient privileges have divergent underlying policies from the physician-patient privilege. There is no reasoned distinction, under the circumstances presented here, between the physician-patient privilege and the social worker-patient privilege or the nurse-patient privilege.

Consistent with *Youngs* and *Upjohn*, we hold that, pursuant to the limitations provided for in *Youngs*, the corporate attorney-client privilege trumps the social worker-patient privilege or nurse-patient privilege "where an ex parte interview enables corporate counsel 'to determine what happened' to trigger the litigation." *Youngs*, 179 Wn.2d at 664 (quoting *Upjohn*, 449 U.S. at 392) (internal quotation marks omitted).

Corporate defense counsel may have privileged ex parte communications with a plaintiff's nonparty social worker or nurse who is employed by the defendant, "only where the communication meets the general prerequisites to application of the attorney-client privilege," the communication is with a social worker or nurse "who has direct knowledge of the event or

20

events triggering the litigation, and the communications concern *the facts of the alleged negligent incident*." *Youngs*, 179 Wn.2d at 664.

Here, the superior court abused its discretion by ruling that *Loudon* applies to the social worker but that the communications are barred by *Youngs*. This ruling is internally inconsistent. Both *Loudon* and *Youngs* discuss "physicians." There is no discernible difference between the "physicians" in *Loudon* and the "physicians" in *Youngs*. If the language of *Loudon* prohibiting contact with "physicians" because of the sanctity of the physician-patient privilege applies to the social worker, then the language of *Youngs* allowing contact with "physicians" to protect the attorney-client privilege also applies.

Moreover, the social worker and the nurses are named parties, further supporting the notion that the corporate attorney-client privilege extends to them. Hermanson's complaint names "Jane and John Does 1-10," and says that "Jane and John Does" are "individuals employed by defendant [MultiCare]" who acted in the "authorized course and scope of their employment of defendant [MultiCare]." CP at 1. Under the policies announced in *Youngs*, MultiCare's corporate attorney-client privilege extends to the social worker and the nurses, who are MultiCare employees and named parties. *See Youngs*, 179 Wn.2d at 661, 664.

D.       *Hermanson's Arguments Regarding Dr. Patterson, the Social Worker, and The Nurses*

We note that Hermanson inaccurately characterizes *Wright v. Group Health Hospital*, 103 Wn.2d 192, 193, 691 P.2d 564 (1984), and *Youngs*, 179 Wn.2d 645 throughout his brief in his discussion of Dr. Patterson, the social worker, and the nurses. Br. of Resp't/Cross Appellant at 19, 20.

21

1. *Wright*

Hermanson cites *Wright* to support his argument that corporate attorney-client privilege cannot be extended to Dr. Patterson because he cannot speak for the corporation. Hermanson also argues that ex parte privileged communication with the social worker and nurses should be prohibited because MultiCare's corporate privilege does not extend to them under *Wright*. Hermanson asserts that under *Wright*, "mere fact witnesses, such as nurses, social workers, or other mere employees" and "independent contractors" have never been within the scope of corporate privilege because they "cannot possibly speak for the corporation." Br. of Resp't/Cross Appellant at 19 (quoting *Wright*, 103 Wn.2d at 201). But *Wright* does not provide the framework for analyzing corporate attorney-client privilege.

In *Wright*, the court addressed a discrete question: whether "a defendant hospital corporation may prohibit its current employees from conducting ex parte interviews with *plaintiffs*' attorneys." *Wright*, 103 Wn.2d at 193 (emphasis added). In doing so, the court analyzed the scope of ethical rules' prohibition against contact with a represented party. *Wright*, 103 Wn.2d at 198, 200. The court clarified that its analysis and holding did not pertain to attorney-client privilege and was distinct from *Upjohn*. *Wright*, 103 Wn.2d at 201-02. And the *Youngs* court rejected the argument that *Wright*'s analysis was applicable to determining the scope of corporate attorney-client privilege. *Youngs*, 179 Wn.2d at 652. The court discussed the differences between the *Upjohn* analysis of corporate attorney-client privilege and its analysis of a disciplinary rule, noting: "A corporate employee who is a 'client' under the attorney-client privilege is not necessarily a 'party' for purposes of the disciplinary rule." *Wright*, 103 Wn.2d at 202.

2. *Youngs*

Hermanson also asserts that "issues of privilege are determined by the status of a person as a party." Br. of Resp't/Cross Appellant at 20. But neither *Wright* nor *Youngs* support his assertion. Both *Wright* and *Youngs* are clear that the determination of a "party" to a lawsuit is a distinct from the determination of a "client" for purposes of attorney-client privilege. *Youngs*, 179 Wn.2d at 652, 661; *Wright*, 103 Wn.2d at 202.

Hermanson argues that "*Youngs* rejected extension of an exception to *Loudon* to hospital staff other than physician-employees." Br. of Resp't/Cross Appellant at 23. Hermanson is incorrect, and his reading of *Youngs* "violates rules of formal logic in a manner known as the fallacy of the inverse or 'denying the antecedent.'" *State ex rel. Banks v. Drummond*, 187 Wn.2d 157, 171, 385 P.3d 769 (2016) (quoting *State v. Brush*, 183 Wn.2d 550, 568 n.8, 353 P.3d 213 (2015)). *Youngs* does not discuss nonphysician employees. To conclude that *Youngs* does not apply because the social worker or nurses are not physicians is relying on the fallacy of the inverse.

Hermanson also says that "[i]f *Youngs* intended its logic could be extended to any hospital employee as MultiCare urges, *Youngs* would not have reversed the trial court's order allowing contact with those other employees." Br. of Resp't/Cross Appellant at 23-24.

A careful inspection of *Youngs* reveals that the plaintiff objected to defense counsel's ex parte contacts with "any other physician who treated him" at the hospital, even though he responded to discovery requests "in a manner that suggested he might bring claims implicating several additional, unidentified physicians." *Youngs*, 179 Wn.2d at 654. Citing *Loudon*, the plaintiff moved to prohibit defense counsel from having ex parte contact with any of his "treating

23

health care providers." *Youngs*, 179 Wn.2d at 654. The superior court ultimately ruled that the defense counsel may have ex parte contact with hospital employees who provided healthcare to the plaintiff. *Youngs*, 179 Wn.2d at 654.

The court concluded:

> [T]he trial court ruled that "counsel for PeaceHealth *may have ex parte contact* with PeaceHealth *employees who provided health care to plaintiff* Marc Youngs." We *affirm* the portion of the trial court's order permitting defense counsel's ex parte communications with Mr. Youngs' *nonparty treating physicians*, *but only as to those physicians* who have firsthand knowledge of the alleged negligent incident and only as to communications about the facts of that incident. We *reverse* the portion of that order permitting ex parte communications with Mr. Youngs' *other nonparty treating physicians* (those lacking firsthand knowledge of the alleged negligent incident) and with any of Mr. Youngs' *nonparty treating physicians* on topics other than the facts of the alleged negligent incident.

*Youngs*, 179 Wn.2d at 672 (emphasis added) (internal citations omitted). There is no indication that there were any nonphysician healthcare providers at issue. Because nonphysicians were not at issue, the court in *Youngs* did not affirmatively rule that nonphysician employees were to be treated unequally.

E.      *Requirement To Seek Leave of the Court*

MultiCare next argues that the superior court erred by requiring Multicare to seek leave of court before having ex parte privileged communications with "[o]ther MultiCare healthcare providers." Br. of Appellant/Cross Resp't at 39. Specifically, MultiCare argues that neither *Loudon* nor *Youngs* supports the superior court's order and that this limitation curtails counsel's ability to assess liability and develop an appropriate litigation strategy.

We review a superior court's discovery order for abuse of discretion. *Richardson*, 200 Wn. App. at 711. A superior court abuses its discretion where the court's decision was

manifestly unreasonable, made for untenable reasons, or based on a misunderstanding of the law. *Richardson*, 200 Wn. App. at 711.

Based on the superior court's order prohibiting MultiCare from having ex parte communications with MultiCare's employees, the court's requirement that MultiCare seek leave of court before talking to other employees is based on a misapprehension of the law. *Youngs* does not require that the superior court interfere with MultiCare's exercise of its corporate attorney-client privilege.

We hold that the trial court abused its discretion in requiring MultiCare to seek trial court approval before engaging in ex parte privileged communications with MultiCare employees, pursuant to the limitations set forth in *Youngs*. We reverse the superior court's order requiring MultiCare to seek leave of court before communicating with other MultiCare healthcare providers.

Despite Hermanson's repeated claim that MultiCare seeks to have unlimited communication and hide facts from discovery, the corporate attorney-client privilege does not allow for unlimited communication here. MultiCare's corporate attorney-client privilege is subject to the limitations set forth in *Youngs*.[15]

---

[15] This case illustrates some practical difficulties encountered by healthcare providers and attorneys in following the *Youngs* rule regarding the appropriate scope of their attorney-client communication. The parties here do not agree on the scope of communications covered by attorney-client privilege. MultiCare argues that Hermanson's entire visit to the emergency room is subject to attorney-client privilege. Hermanson, however, argues that counsel's ex parte communications must be limited to the alleged wrongful disclosure itself, not treatment generally. The trial court did not resolve this issue.

No. 51387-1-II

## CONCLUSION

In conclusion, we affirm the portion of the superior court's order prohibiting ex parte privileged communication with Dr. Patterson. We also affirm the portion of the order allowing ex parte privileged communications with the nurses. We reverse the portion of the superior court's order prohibiting ex parte privileged communications with the social worker. And we reverse the portion of the order requiring MultiCare to seek leave of court before having ex parte communications with MultiCare healthcare providers.

_____
Worswick, P.J.

I concur:

_____
Cruser, J.

GLASGOW, J. (concurring in part, dissenting in part) — I concur in the majority's decision to affirm the portions of the superior court's order allowing ex parte privileged communications with the nurses, reversing the portion of the order prohibiting ex parte privileged communications with the social worker, and reversing the portion requiring MultiCare Health System to seek leave of the court before having ex parte communications with MultiCare employees. I disagree only with the majority's conclusion that MultiCare cannot have privileged ex parte communications with Dr. David Patterson about Doug Hermanson's claim. MultiCare admits that Dr. Patterson is its agent and that MultiCare is liable for his actions performed as its agent. I see no meaningful difference between the employer-employee relationship and the agency relationship that exists between Dr. Patterson and MultiCare for purposes of applying the attorney-client privilege. Therefore, I respectfully dissent in part, and would reverse the portion of the superior court's order prohibiting MultiCare's attorney from having ex parte privileged communications with Dr. Patterson.

*Youngs v. PeaceHealth* recognized the limiting principle, implied in *Upjohn Co. v. United States*, that the scope of the corporate attorney-client privilege is tied to the attorney's responsibility "'to determine what happened'" in order to give sound and informed advice. 179 Wn.2d 645, 664, 316 P.3d 1035 (2014) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 392, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)). Under *Youngs*, corporate defense counsel may have privileged ex parte communications with the treating physician only where the communication meets the general prerequisites to the application of the attorney-client privilege, the communication is with a physician who has direct knowledge of the event or events triggering the litigation, and the communications concern the facts of the alleged negligent incident. *Id.*

*Youngs* reasoned that this rule "strikes the proper balance" between the attorney-client and physician-patient privileges, limiting *Loudon v. Mhyre*, 110 Wn.2d 675, 756 P.2d 138 (1988) "to the extent necessary to protect a corporate defendant's right to fully investigate its potential liability." *Youngs*, 179 Wn.2d at 665.

At their core, *Upjohn* and *Youngs* established a flexible approach to corporate attorney-client privilege, with the central goal of promoting candid and honest communication between a corporation's attorney and the individuals acting as agents of the corporation who may know the factual details germane to the legal problem. *Upjohn*, 449 U.S. at 389; *Youngs*, 179 Wn.2d at 664. But *Youngs* also set limitations to ensure maximum possible protection of the physician-patient privilege. *Youngs* struck a balance between the attorney-client and physician-patient privileges, a balance that I think should apply equally to employees and to individuals whom a defendant healthcare provider has admitted are its agents for the purposes of liability.

Although our Supreme Court in *Newman v. Highland School District No. 203* declined to expand the scope of the privilege outside the employer-employee relationship, in my view *Newman* is distinguishable from this case. 186 Wn.2d 769, 780, 381 P.3d 1188 (2016). *Newman* involved a former employee who was no longer an agent of the corporation. *Id.* at 775, 780. The court declined to extend the scope of the privilege articulated in *Upjohn* beyond the employer-employee relationship not because of a rigid adherence to the definition of "employee," but rather, because the termination of the employer-employee relationship also terminated their agency relationship. *Id.* at 780. The court reasoned that the privilege did not apply to a former employee because a former employee "can no longer bind the corporation and no longer owes duties of loyalty, obedience, and confidentiality to the corporation." *Id.* Thus,

without an ongoing principal-agent relationship, the former employees in *Newman* were no different from other third-party fact witnesses who could be freely interviewed by either party. *Id.* at 780-81.

The distinction in *Newman* was temporal:  the former employees were not covered by the privilege because they were no longer agents of the corporation.  Here, on the other hand, although Dr. Patterson is formally employed by Trauma Trust, he is an admitted agent of MultiCare.  In this way Dr. Patterson is not like other third-party witnesses.  *See id.*  He is not a neutral, indifferent observer, but, rather, is no different from an employee because he has an ongoing duty of loyalty towards MultiCare.  This continuing agency relationship would surely benefit from forthright communication with MultiCare's attorney "'to determine what happened'" just as much as the formal employer-employee relationship contemplated by *Youngs* and *Upjohn*.  *Youngs*, 179 Wn.2d at 664 (quoting *Upjohn*, 449 U.S. at 392).  Treating Dr. Patterson differently is at odds with the delicate balance that our Supreme Court struck in *Youngs*, and I see no compelling justification for departing from those principles simply because he is an agent but not a formal employee.  *Newman*'s exclusion of *former* employees does not prevent us from recognizing that Dr. Patterson is no different from an employee of MultiCare and should be covered by the corporate attorney-client privilege.

Consistent with the Eighth and Ninth Circuits, I would instead recognize that Dr. Patterson is the "functional equivalent" of an employee and so should be subject to the same rules of corporate attorney-client privilege.  *See In re Bieter Co.*, 16 F.3d 929, 938 (1994); *see also United States v. Graf*, 610 F.3d 1148, 1159 (2010).  Adopting this "functional equivalent" standard would be consistent with the limitations on the privilege imposed by *Youngs* and would

support the flexible balancing of privileges envisioned by *Youngs* and *Upjohn*. Like employee treating physicians, those who are the functional equivalent of employees would still only be allowed to have privileged ex parte communications with corporate defense counsel where the communication meets the general prerequisites for applying the attorney-client privilege, the physician has direct knowledge of the events triggering the litigation, and the communications concern the facts of the alleged incident. *Youngs*, 179 Wn.2d at 664. The attorney-client privilege would protect the privileged communications only and it would not shield from opposing counsel the facts transmitted in those communications. *Id.* at 653.

With these limitations, applying the privilege to someone who is the functional equivalent of an employee would allow corporate counsel to quickly and fully investigate the corporation's potential liability, promoting, for example, early and efficient resolution of cases. *Id.* at 665. And the balance struck by *Youngs* between the attorney-client and physician-patient privileges would remain unaffected by including functional employees under the scope of the corporate attorney-client privilege. *See id.* at 665.

Like the majority, I recognize our Supreme Court's reluctance thus far to expand the scope of the privilege beyond the employer-employee relationship. But Dr. Patterson is no different in any relevant respect from an employee of MultiCare, and allowing him to have ex parte privileged communications does not expand the scope of that privilege in any meaningful sense.

I would therefore apply *Youngs* in this case and conclude that MultiCare may have privileged ex parte communications with Dr. Patterson, subject to the many limitations imposed by *Youngs* on those communications. I would accordingly reverse the superior court's order

prohibiting ex parte privileged communication with Dr. Patterson. In all other respects I concur

in the majority's decision.

_____
Glasgow, J.